page 1 of 9

United States District Court

Southern District of Illinois

Plaintiff: Oscar Dillon III

v.

Case No. 19-1265-JPG
(clerks office will provide)

Defendant: Michael A. Reilly

Defendant: James Williams

Defendant: Tom Llewellyn

Defendant: James Gaddy

1.) (A) The Cause Of Action is intended to be under civil statute
(B)
1983 Bivens. The County in which the plaintiff is housed is Randolph County, Illinois.
(C) The Plaintiff: Oscar Dillon III is currently a Federal Pretrial Detainee.
(D) All the Defendants listed above: (1.) Michael A. Reilly #43908 Mo,
employed as an Assistant United States Attorney in the ("E.D.M.O."), Eastern
District of Missouri; (2) James Williams, employed as a Telecommunications
Specialist for St. Louis Metropolitan Police Department also Detached to the ("FBI"),
Federal Bureau of Investigation nonfield position; (3) Tom Llewellyn, employed as a
Detective for St. Louis Metropolitan Police Department; and (4) James Gaddy employed
as a Task Force Officer for the ("DEA") Drug Enforcement Agency.
(E) All four named Defendants listed above are being sued in their
individual capacity and Official capacity.

2.) On December 1, 2016 Oscar Dillon III was Indicted in the Eastern
District of Missouri Case No. 4:15-CR-00404 HEA-NAB. Due to the conduct that
clearly violate established statutory and constitutional rights of which a reasonable
person would have known a Dismissal of the Indictment was filed in November 2017
for Outrageous Government Misconduct. And that Motion to Dismiss has now been
Supported in Brief (Doc. #: 2167) which will be an (Attachment (A)) to this
cause of action. The Plaintiff ("Dillon") asserts that if it had not been for the

initiation of conspired behavior by the Attorney for the government and its agents, police and assumptions of Qualified Immunity protection, he (Dillon), would have safeguarded privileges that protected constitutional rights afforded to him and nullify compounding circumstances separate from case No. 4:15-CR-00404 Unlawful arrest. Defendant: 1.

(A1) Michael A. Reilly's Competency of Knowingly violating 28 C.F.R. 0.39 et seq. and Laws, in short, Title 18 section 1623 provides: Whoever under oath or in any declaration, certificate, verification or statement under the penalty of perjury in any proceeding before or ancillary to any court or grand Jury .... shall be fined under this title or imprisoned. Short Description: Because ("Reilly") was in every Proffer session of CW-A and CW-B and participated in the debriefing, the inconsistencies and untruthfulness as described by ("TFO") James Gaddy in a transcribed evidentiary hearing noted in the Brief in Support page 23 of (Doc.#:3167) was also known to Reilly prior to the indictment December 1, 2016. (A2) Title 18 crimes and criminal procedure section 2235 provides: Whoever maliciously and without probable cause procures a search warrant to be issued and executed shall be fined or imprisoned. Short Description: as noted on page 1 of (Doc.#:3167) False Information in eight affidavits for search warrants, Reilly asked for and authored information in seeking the warrants issued and executed. (A3) Title 18 U.S.C. section 1519 provides: Whoever Knowingly alters, destroy, mutilates, conceals, cover up falsifies, or make false entry in a record, document with intent to impede, obstruct or influence the investigation or proper administration of any matter within the Jurisdiction of any department or agency of the United States shall be fine or imprisoned. Short Description: as noted on page 12 of (Doc.#:3167) Reilly, as James Williams testified to drafts of ("Williams"), his affidavit were passed between Reilly and others with notes on what to change, in which content in the affidavit contradicts what Williams testified to, as repeatedly noted on page 9, 10, 11, and 13 of (Doc.#:3167).

(A4) Aside of violations of Laws absently implemented herein Reilly unscrupulasly rendered candor to the Court pursuant to Model Rules of Prof'l Conduct R.3.3 in an abundance of submissions and in Court misrepresentations. Short Description: As noted on page 17 of (Doc#:2167) Officer Michael Betz testified[3] On August 31, 2017, he (Betz) emailed members of the team including Assistant U.S. Attorney Michael Reilly and James Gaddy and informed them of the results of his search which was historical dates received dating almost three months from the initial date of the requested. In spite of Reilly receiving this information August 31, 2017, the very next day September 1, 2017 in response (see Doc.# 1223) Reilly (asserts) no historical data was ever requested; when in fact prior to Dillon getting indicted December 1, 2016, Reilly in February 2016 and dates subsequent authored and asked for historical data himself in no less than eight warrants.

This conduct along with more to shar, if giving the opportunity, Unequivocally surpasses the competency of Knowingly Violating establish statutory and constitutional rights.

(B1) Defendant 2. James Williams, for the sake of terseness, as previously described: Williams repeatedly PerJured himself under oath testifying contrary to what was sworn to in his affidavit as noted in (Doc.#2167) pages 9, 11, and 13, which is in violation of Title 18 section 1623.

(B2) As a Telecommunication Specialist for the FBI along with a Seasoned Veteran prosecuting Government Attorney, Reilly and Williams, theres no such thing as deleting information relative to a Federal investigation, unless its manually done. In all discoverable information lagged or booted to an FBI database or FBI internal system and all emails relative to an investigation can be obtained and are automatically archived through an email system called the "Enterprise Vault", which automatically archives all emails older than 30 days that have been sent or received by Criminal Division Employees.

This is also contrary to the position James Williams testified to

On page 10, and that is: Whatever documents he (Williams) had on his computer with respect to this case were somehow deleted from his computer. Albeit, on page 10, Williams testified with respect to this case everything was somehow deleted, but contrary to Williams testimony when emails given to Dillon order upon the Judge as requested by Dillon, not only did it showed an email, but also showed that Williams did in fact have the historical request information (et) and it also showed that the historical information was downloaded as requested by Reisig, the Supervisor which contradicts that Williams files were deleted with respect to this case. (B3) This along with the Passing and changing notes on what to submit in a sworn affidavit with the help of Reilly, especially being that it contradicts sworn testimony surely violates Title 18 U.S.C. Section 1519, and Obstruction of Justice Title 18 U.S.C. Section 1503

(C1) Defendant 3.
                    Tom Llewellyn, as testified by TFO James Gaddy was also at every proffer session of CW-A and CW-B along with Michael Reilly, thus having debriefed and heard the same inconsistencies and untruthfulness as those named to be present as well. As noted on page 4 (Doc #:2167), in an email sent to many if not all law enforcement personnel working on the investigation ("Llewellyn") was one of two who were to be conduits to get all reports and discovery matters to the U.S. Attorney's Office. Llewellyn, as one of the Lead investigators armed and privy to all reports and discoverable matters Summarized and elicited information to the Grand Jury he knew to be untrue. Which is in violation of Title 18 section 1623.

(C2) Although a witness should enjoy the same immunity as witnesses at trial arising from their initiation of a criminal case, but surpassing vindictiveness crossing the threshold of conspiratorial conduct which furnishes a [knowingly] element such premeditated behavior underhand

the Moral uprightness in the administration of Justice, therefore
Llewellyn violated the law as a peace officer that he was sworn to uphold.
To underscore, as known to Llewellyn before summarizations of his
testimony, is that: as explained by TFO Gaddy answering [No] to
the question: "Besides your conversations with CW-B, besides your
conversations with CW-A, besides the phone records, any phone records
that you got during your investigation, was there anything else or anyone
else telling you that ..... Mr. Dillon met with CW-B or CW-A on or
about January 10th [or 11th], 201[6]?" Answer by James Gaddy: [No].
(D¹) Defendant.⁴ James Gaddy, as noted on page 17 (Doc.#2167)
On August 31, 2017 received an email along with Reilly from Officer
Michael Betz with the results of the search which was historical
information that Reilly stated in a submission to the Court the Government
never asked for or received, again, see (Doc.#:1223), September 1, 2017 the
very next day after the email was received and in a Open Court hearing
September 25, 2017, Reilly stating the same, see Judges order (Doc.#:1254).
(D²) James Gaddy, equipt with information as he, ("Gaddy") testified to
that he was also at every proffer session of CW-A and CW-B, where he also
heard the inconsistencies and untruthfulness; Coupled with that, James
Gaddy was present July 27, 2016 during the arrest of CW-A and CW-A's
attempted suicide by cop, unavailing in the attempt, James Gaddy
immediately after with the same suicidal mind set made a statements he,
(CW-A) was willing to go to his Grave with, which is contrary to the
Government's elicited information to the Grand Jury although knowing of
its untruthfulness prior to the fourth superceding Indictment
December 1, 2016. CW-A's statement was made directly to James Gaddy
in interview. See page 22 of (Doc.#2167). This is the Crux of the
Entire investigation.

(D3)   As aforementioned throughout this call For Civil Action, the conspired conduct previously Known to James Gaddy are prohibitive to his affirmative duties as a civil servant and are also against the Laws of the United States in violation of Title 18 U.S.C. Section 4, which provides: (Whoever), having Knowledge of the actual commission of a Felony cognizable by a Court of the United States, conceals and does not (as soon as possible) make Known the same to some Judge or other person in civil or military authority shall be fined or imprisoned.

(E¹)   (A) The conspiratorial actions of all defendants in this Civil cause of Action caused the Plaintiff Oscar Dillon III an immense compounding, endured and debilitating pain and suffering. (B) This caused the unconstitutional protection of being equally protected as provided by the 14th Amendment and because of compounding endeavors dDillon was unafforded to not be able to escape purgatorial subjugation because of an unlawful arrest on case 4:15-cr-00404 which annihilated the chance for Bail because of false information elicited in Bail hearings in violation of the 8th Amendment. (C) Not being able to be on bond caused Dillon not to be able to attribute child support in finance, child care, education, nourishment and Love through Fatherhood with my four year daughter, as though done with my now adult children, especially because at the time of arrest my daughter was a little over one years old and Dillon, at that, time was the sole care taker of his daughter. (D) Also not being able to continue help caring for my ailing Grandmother with Alzheimers disease who has now passed away along with my Grandfather who both partook care in raising and caring for me. (E) Health issues from prohibited recreation that now have Dillon on medication. Also Dillon now have swollen feet, blurred vision, sciatic nerve damage, muscle spasms, High blood pressure, and a infected tooth causing Dillon to swollow bacterial infected mucus, Although reported, but not

yet seen by a Dentist. Dillon now feels hes a valetudinarian.

Conclusion of "Statement of Claim"

3.) Relief Saght: (A) A sum of forty million Dollars, (B) A thorough inquisitorial review and investigation by the appropriate Department of Justice Authorities (C) Actual damages and punitive damages comes from the exhaustion of Family and Friends Due to exceptionally large cost from health, hygiene, trial and pretrial preparation, commissary and Telephone communications with Friends and Family Loss of Wages in various Job descriptions: private investigator, professional musician, wear and tear on vehicles from family visits taking Four hour to drive the facility and back twice a seek and all other incurred expenses that occurred from Jail incentives. (D) These expenses thats listed are expected to be paid back in Full by Oscar Dillon III to Family and Friends. (E) All other reasons for relief are listed herein on page 6 as aforementioned.

4.) (A) Previous Lawsuits: Theres been a Previous Suit filed in the Southern District of Illinois, case number 3:18-cv-02124 JPG filed on December 17, 2018 Oscar Dillon III informed the court of the misunderstanding and never intended to initiate that action. The Honorable Judge Gilbert appropriated a strike to that complaint and terminated that action. see (case 3:18-cv-02124 JPG Document 5). (B) Vitally Important, reasoning to also include to the now current cause of action can be found on case 3:18-cv-02124 JPG (Document 4) and asks this Honorable Court to exhibited (Document 4) to the now current cause of action for the purposes to be Juxtaposed.

5.) (A) Understanding the necessity to conserve Judicial Resources the Plaintiff Oscar Dillon III concent to proceed be fore a Magistrate Judge in accordance with 28 U.S.C. section 636(c) in this civil action (Including a Jury or non Jury trial). (B) But Oscar Dillon III wants to have a Jury Trial.

6.) (A) Including in this cause of action Is a 33 page of transcripted facts that was submitted In Brief In support of the Dismissal of Indictment For outrageous government conduct and ask that this Honorable Court except this Exhibited proof of the Factual allegation in support of this civil cause of action. It will be labeled as (Attachment A).

(B)  Forced to file this as a Pretrial Detainee: Because (Attachment A) is have been taken under advisement after the Government filed their last response May 8, 2019, it has now been (6), six plus months and to date there's been no ruling on the motion. And this has now created a Speedy Trial Issue referring to subsection F and J under The Speed Trial Act 3161, which are now codified as Subsection D and H respectively, which provides: when a motion requires a hearing that time after a hearing needed to allow the Court to assemble all papers reasonably necessary to dispose of the motion e.g. the submission of post hearing briefs at that point the Court have taken the motion "under advisement" and has thirty excludable days in which to rule. The Clock begins to tick again at the end of that thirty day period regardless of when the Court ultimately rules on the motion.

(C)  Duly Highlighting, if this Honorable Court has any doubt as to this Civil cause of Action, Dillon would like to turn this Courts attention as to the many claims in the Governments Responses to the motion to Dismiss on case# 4:15-CR-00104 starting in the month of December 2017 in which the Government States: the evidence and assertions thats been submitted by ..... Mr. Dillon is baseless and Frivolous. And asking the Courts in no less than three responses to Deny the Dismissal outright, that Mr. Dillon has no merit to proceed in evidentiary hearings and discontinue the hearings from going Forth and also deny the issuing of Grand Jury transcripts. In every instance the Governments request were declined.

7.)     Giving that the Case stems from the Eastern District of Missouri, Since Oscar Dillon III in this attempted Civil Cause of Action is being housed in Illinois ("Dillon") is uncertain as to which Court to file the litigation in.

8.)     Also Dillon is asking that the Honorable Court to waive the filing fee and proceed until such Jurisdiction is established.

      The undersign affirms that the information provided above is true and correct.

Date: November 2019     Respectfully Submitted:

                  Oscar Dillon III

nine pages and a thirty three page Attachment Labeled (Attachment A).

(Attachment A)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

UNITED STATES OF AMERICA,          )
                                   )
                Plaintiff,         )
                                   )   No.: 4:15-CR-00404 HEA/NAB
        vs.                        )
                                   )
OSCAR DILLON, III, and             )
MICHAEL GRADY,                     )
                Defendant.         )

## DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTIONS TO DISMISS INDICTMENT

Now come the defendants, by and through their undersigned attorneys, and respectfully submit the following brief in support of their motion to dismiss indictment:

## INTRODUCTION

The government and its agents have engaged in a pattern of flagrant misconduct during the investigation and prosecution of the defendants, Michael Grady and Oscar Dillon. The government has done more than make one simple mistake, it has repeatedly engaged in misrepresentations and obfuscation such that the defendants' rights have been violated. Not only did the government present false information to a grand jury and include that false information in eight affidavits for search warrants of Michael Grady's cellular phones, the government then represented to the court that it did not have the records from the pertinent warrant that would expose their misrepresentations, when in fact two separate agencies under the government's direction had the missing historical records in

their possession.  Despite having both toll records and historical cell phone records that contradicted their cooperating witness, the government then presented contradictory testimony of another cooperating witnesses, knowing that one of the testimonies was and *had to be* false.

Essentially, the government knowingly presented the testimony of two cooperating defendants, CW-A and CW-B, to the grand jury, both of whom not only contradicted each other, but were otherwise contradicted by historical cell phone records the government had in their possession for months. This is inexcusable. Such conduct, without a doubt, amounts to the type of flagrant conduct and pattern of misconduct necessary to dismiss the indictment. Although the government attempts to characterize its conduct as a simple mistake and a misunderstanding of a word with plain meaning, the cumulative effect of the government's behavior has led to a due process violation and undermines the integrity of the judicial process. The prejudice of this prosecutorial misconduct, as evidenced throughout the evidentiary hearings, is irreparable and requires nothing short of dismissal.

## GENERAL LEGAL BACKDROP

Dismissal of an indictment is warranted, for prosecutorial misconduct, when there is "flagrant misconduct" which actually prejudices a defendant.  United Sates v. Darden, 688 F.3d 382, 387-88 (8th Cir. 2012); *see also United States v. Wadlington,* 233 F.3d 1067, 1074 (8th Cir. 2000) (finding that dismissing an indictment due to prosecutorial misconduct is proper when there is "flagrant misconduct" and "substantial prejudice" to a defendant's rights. To meet this

burden, an individual seeking dismissal must show that: 1) the prosecutor's conduct

was in fact improper; and 2) the conduct prejudiced the defendant's right to Due

Process. *United States v. Jones*, 795 F.3d 791, 799 (8th Cir. 2015); *See United States

v. Kouba*, 822 F.2d 768, 744 (8th Cir. 1987) (dismissing an indictment due to

abusing the grand jury process "is appropriate only upon a showing of actual

prejudice" to the defendant). To that end, a violation of Due Process occurs when the

prosecutor's conduct is so egregious" that it renders the defendant's trial

fundamentally unfair. *Stringer v. Hedgepeth*, 280 F.3d 826, 829 (8th Cir. 2002).

"Absent demonstrable prejudice or substantial threat thereof" dismissal is not

warranted, even if the violation was deliberate. *Wadlington*, 233 F.3d at 1074.

The Eighth Circuit has found, however, that there need be only "*some

evidence of gross deception by the prosecutor*" to dismiss an indictment for improper

grand jury conduct. *United States v. Cady*, 567 F.2d 771 (8th Cir. 1977) (emphasis

provided). While this Circuit has not expressly ruled what level of misconduct

warrants dismissal besides "gross deception" and intentional conduct, other Circuits

have addressed the issue. For example, the Third Circuit has held that "a pattern of

constitutional violations" on behalf of the prosecutor establishes that he acted

recklessly while prosecuting the defendant, and, therefore, engaged in "willful

misconduct" warranting dismissal of an indictment. *Government of Virgin Islands v.

Fahie*, 419 F.3d 249, 255-56 (3rd Cir. 2005) (joining the Ninth and Tenth Circuits in

finding willful misconduct warrants dismissing an indictment); *see also United

States v. Kearns*, 5 F.3d 1251, 1253 (9th Cir. 1993) (echoing the Eigth Circuits

3

"flagrant misbehavior and substantial prejudice" prosecutorial misconduct analysis). Similarly, the Second Circuit has held that dismissal is warranted when the prosecutor knowingly or recklessly misleads a grand jury as to an essential fact. *United States v. Lombardozzi*, 491 F.3d 61 (2nd Cir. 2007). The Eighth Circuit has also relied on and adopted Second Circuit precedent addressing claims that the government knowingly presented perjured testimony to the grand jury regarding a material issue to deliberations. *See, e.g., United States v. Levine*, 700 F.2d 1176, 1179-81 (8th Cir. 1983).

## ARGUMENT

As detailed in Defendant Grady and Dillon's motions to dismiss, replies to the government's responses to the motions to dismiss, and related filings, the specific instances of misconduct by the government are not limited to the misrepresentations and lengthy delay regarding Grady's historical cell site cell phone data. Grady and Dillon have also maintained that the misconduct of the government and its agents similarly relates to the government's requests for search warrants, and the information presented to the grand jury.

I.   **Agent Burke's Testimony Established That Multiple Agencies Were Working Together And Under Direction of the United States Attorney's Office**

On February 4, 2016, FBI agent Brandon Burke sent an email to many, if not all, of the law enforcement personnel working on the investigation. See Def. Ex. M (Bates #MG/OD-E-00263-266). According to Agent Burke, he (and SLMPD Officer Llewellyn) were the conduits to get all reports and discovery matters to the U.S.

Attorney's Office. Additionally, Agent Burke informed the team - the most recent development is "(now) subjects Dillon and Grady intentionally obstructing justice as it relates to CW-A. More details on this matter can be briefed in person in lieu of email." Def. Ex. M. As of February 4, 2016, the only evidence the government had to rely on in labeling and investigating Grady and Dillon as "targets" was the February 2, 2016 proffer of CW-B and his now defunct story about a meeting that occurred on "approximately January 10th or 11th, 2016" between CW-B, Grady, and Dillon.

Dillon and Grady were thereafter labeled as targets in multiple CSS/PLW/GPS warrants issued on 2/5/16; 3/3/16; 3/8/16; 3/11/16; 5/5/16; 5/13/16. See Gov. Ex. M-1. For example, the affidavits and applications for CSS warrants asserted the government had probable cause to believe information relating to the use of any cell phones by Dillon – "TARGET SUBJECT" – will lead to relevant evidence in the investigation of allegations that TARGET SUBJECT and others are committing the following offenses: *conspiracy to distribute controlled substances, conspiracy to commit money laundering, obstruction of justice, and unlawful flight to avoid prosecution.* See Def. Ex. L, pp. 2-3; MG/OD 892[1].

Moreover, on 2/17/16, while fugitives like CW-A were still on the run, government agents discussed how important it was to focus on targeting Grady and Dillon. See Def. Ex. J; see also Tr. 8.22.18 at 154-55. Without any additional

---

[1] In the Application for the same 2/5/16 CSS warrant, AUSA Reilly asserts: "there is evidence that Dillon - "TARGET SUBJECT" – has been and will be using cellular telephones in furtherance of a criminal offense(s), namely: *conspiracy to distribute controlled substances, conspiracy to commit money laundering, obstruction of justice; unlawful flight to avoid prosecution.*"

information implicating Dillon and Grady as "Targets" in the investigation, AUSA

Reilly scheduled a meeting for April 22, 2016, the purpose of which was, in part, to

figure out how to "get" Dillon and Grady. See Def. Ex. K; see also Tr. 8.22.18 at 155-

56.

II.  **Ryan Keep, Custodian of Records for Sprint, James Williams and Detective Corcoran Established That Both the FBI and the SLMPD had Downloaded the Historical Cell Phone Records.**

a.  **Ryan Keep Custodian of Records, Sprint**

Ryan Keep, custodian of records, established that two separate entities had

access to the Sprint Records the - FBI and the St. Louis Police Department, and

both served court orders on Sprint for those records. (Tr. 7.18.18, at 14). Mr. Keep

testified that when Sprint receives a legal demand, they review it to verify the dates

that are being requested. (Tr. 7.18.18, at 43). With respect to toll records, toll

records may be requested pursuant to a subpoena, and the dates of the records

requested must be listed in the subpoena.  A subpoena requesting toll records must

be signed by a United States Attorney and not an agent.  (Tr. 7.18.18, at 85).  An

individual receiving toll records also receives a document containing instructions on

how to read the toll records. (Tr. 7.18.18, at 85).  Someone receiving the toll records

contained in Defendant's Exhibit on February 4, 2016 would be able to determine

that the individual using the cell phone was not in St. Louis on a particular date.

(Tr. 7.18.18, at 85).

A switch always has the same dedicated towers from which it routes cell

phone calls.  (Tr. 7.18.18, at 81).  The switch identified by the number 209 covers an

area which includes Orlando, Florida, but not St. Louis, Missouri. (Tr 7.18.18, at

80). For the period of time of January 10th and January 11th 2016, Michael Grady's

cell phone routed through the 209 switch, covering the Orlando, Florida area. (Tr.

7.18.18, at 82-84)

With respect to the historical cell cite data, the historical cell records for the

dates in question were sent from Sprint to the FBI on February 10, 2016 at 9:06 am

and then again on the same day at 10:57 am to an individual named James. (Tr.

7.18.18, at 33). For the historical records provided to the FBI, (Gov. Ex. M-11) start

date is December 23rd, 2015—a date well before the February 5, 2015 start date

authorized by the warrant. (Tr. 7.18.18, at 50). A copy of the historical records was

also sent to the St. Louis police department. (Tr. 7.18.18, at 38). The government

never disclosed that a separate agency, the SLMPD, also had requested the

historical records and also had their own copy of those records in any of the

government's filings in response to Grady's Motion to Compel Production or either

defendants' motions to dismiss.

Government's exhibit M-7 shows that the zip file sent from Sprint containing

three files, the GPS compliance letter, the subscriber information compliance letter,

and a historical call detail records with cell site information, was extracted, and all

three files were available in their extracted form on a St Louis Police Department

computer. (Tr. 7.18.18, at 56-58). The historical call detail records with cell site

information were downloaded onto a St. Louis Police Department computer on

February 6, 2016. (Tr. 7.18.18, at 58)

Sprint only sends records that are available at the time that the request is made. (Tr. 7.18.18, at 99). Once a file becomes available from Sprint to download, a user can download the file as many times as he or she would like. (Tr. 7.18.18, at 56). If a historical record document sent from Sprint contained a shorter time period than what had been sent originally from Sprint, someone would have edited the documents after being sent from Sprint. (Tr. 7.18.18, at 101).

   b. **James Williams, Telecommunications Specialist, FBI**

James Williams testified that he served the warrant and order in question on Sprint on February 9, 2016. (Tr. 8.21.18, at 40). According to Mr. Williams, when he first receives a warrant and order, he has to read through the order to determine what data to request. Mr. Williams believed he received the order from Detective Michael Betz. (Tr. 8.21.18, at pg 41).

Mr. Williams took directions from the agents who presented him with the signed warrants and orders.  If the agents only wanted certain things, even if the warrant authorized more, Mr. Williams would only request those certain things.  If the agents told him specifically not to request records, he would not request them from Sprint. (Tr. 8.21.18, at 42-43).

When Sprint has records available for a requestor to download, they send an email notification indicating that there are records to download.  Mr. Williams did not search his emails to determine if or when Sprint sent that email to him.  (Tr. 8.21.18, at 62).  When Mr. Williams downloads the records available from Sprint, they are downloaded as a zip file that contains all of the records Sprint is making

Case: 4:19-cv-03119-DDN   Doc. #: 1   Filed: 11/18/19   Page: 18 of 44 PageID #: 18
Case: 4:15-cr-00404-HEA-NAB   Doc. #: 2167   Filed: 04/03/19   Page: 9 of 33 PageID #:
10208

available for download. Mr. Williams is not able to download the records that are made available in a piecemeal fashion. (Tr. 8.21.18, at 84).

The L-Site is used to download the compliance letters, the historical cell site records, and the subscriber information. (Tr. 8.21.18, at 87). Those are the records that would be contained in the zip file available to download from the L-Site. (Tr. 8.21.18, at 48). With respect to the records in questions, Mr. Williams did, in fact, request the call detail records with cell site location. (Tr. 8.21.18, at 48). This testimony is in direct opposition to Williams' sworn affidavit in which he states that he did not request the Call Detail Records with Cell Site, even though the warrant authorized him to make that request. (Gov. Ex. M-3, para 5).

On February 10, 2016, when the records became available, Mr. Williams downloaded the historical cell site records, the subscriber information, and the Sprint letter. (Tr. 8.21.18, at 25, 103). Although Mr. Williams downloaded the records on February 10, 2016, he did not pass them along to anyone. (Tr. 8.21.18, at 103). Mr. Williams testified that he would only forward the information on if the agents specifically requested it. (Tr. 8.21.18, at 38). If the records are not specifically asked for by an agent working the case, he had no reason to forward them. (Tr. 8.21.18, at 29). This testimony directly contradicts Mr. Williams' affidavit, in which he states "[I]t has been my practice after downloading documents from Sprint, to send the documents to the case agent by email." (Gov. Ex M-3, para. 15).

On February 10, 2016 when the files were ready to be downloaded, they

Case: 4:19-cv-03119-DDN   Doc. #: 1   Filed: 11/18/19   Page: 19 of 44 PageID #: 19
Case: 4:15-cr-00404-HEA-NAB   Doc. #: 2167   Filed: 04/03/19   Page: 10 of 33 PageID #:
10209

would have only contained historical cell phone records, not prospective cell phone
data. (Tr. 8.21.18, at 95). Mr. Williams believed that he had only requested call
detail records going back as far as February 5, 2016. (Tr. 8.21.18, at 34). According
to Mr. Williams' affidavit, during his November 8, 2017 conversation with Sprint,
Sprint advised that the records had already been downloaded, but could not advise
who had downloaded the records. (Gov. Ex. M-3).

Mr. Williams recalled receiving a second copy of the compliance letter
from Sprint in August or September when he asked them to resend everything
Sprint had provided via the L-Site. (Tr. 8.21.18, at 87). He received a third copy of
the letter in November when he first "learned" he could change his parameters to
download the originally provided zip file. (Tr. 8.21.18, at 88). Mr. Williams claimed
that whatever documents he had on his computer with respect to this case were
somehow deleted from his computer. (Tr. 8.21.18, at 28). Contrary to Mr. Williams'
precarious circumstances, SLMPD Officer Betz testified that he would doubt that
any SLMPD officer would just delete cellular records received in response to a
warrant because no one from the department asked for a copy of them. (Tr. 8.22.18,
at 220).

Mr. Williams also established that the GPS prospective data and the
historical records come in two different forms.  The prospective data is a constant
stream of information being sent from Sprint to the requester. (Tr. 8.21.18, at 17-
18).  The prospective data is received by the FBI in a dedicated system at Quantico,
while the historical records are kept in a separate system. (Tr. 8.21.18, at 61). The

Case: 4:19-cv-03119-DDN   Doc. #: 1   Filed: 11/18/19   Page: 20 of 44 PageID #: 20
Case: 4:15-cr-00404-HEA-NAB   Doc. #: 2167   Filed: 04/03/19   Page: 11 of 33 PageID #:
10210

historical cell records are one document that is made available for download from
the L-Site while an email notification of the availability of the download is
simultaneously sent to the requestor. (Tr. 8.21.18, at 17-18).

At some point Mr. Williams became aware that there was a request for
historical cell phone records. (Tr. 8.21.18, at 18). The first time he was asked to look
for these historical records was in August 2017. (Tr. 8.22.18, at 25). Mr. Williams
was directed by his supervisor to look for the records specifically relating to
historical cell site location data. (Tr. 8.22.18, at 14). Yet, Mr. Williams only searched
the system containing the prospective cell phone records and only provided the
prospective cell phone data, even though he was aware that the defense had
requested historical cell phone data. (Tr. 8.21.18, at 19, 28). From August 2017
through November 8, 2017, Mr. Williams did not conduct any other searches for
historical cell records, did not speak with SLMPD Officers regarding the duplicate
warrant he was aware they had served on Sprint, or attempt to reach out to a
Sprint/L-Site representative. It was not until November of 2017 that Mr. Williams
claims he first determined that the FBI had access to the pertinent historical cell
phone data. (Tr. 8.21.18, at 29). Mr. Williams' testimony was contradicted by his
own affidavit. See Gov. Ex. 3 (Mr. Williams states that the records he obtained from
Sprint verified that he had only requested call detail records with cell site from
February 5, 2016 to March 20, 2016).

Government's exhibit M-6A, according to Mr. Williams, contains the
initial cell phone information provided to the defense that was received from Sprint

Case: 4:19-cv-03119-DDN   Doc. #: 1   Filed: 11/18/19   Page: 21 of 44 PageID #: 21
Case: 4:15-cr-00404-HEA-NAB   Doc. #: 2167   Filed: 04/03/19   Page: 12 of 33 PageID #:
10211

pursuant to the Precision Location Warrant, including the cell site documents. (Tr. 8.21.18, at 18). Mr. Williams' supervisor verbally instructed him on what specific files to download, and those were the only files he downloaded. (Tr. 8.21.18, at 74); see Def. Ex. B (MG/OD-E-490-492) (In an 8/31/17 email, Mr. Williams states: "I have downloaded what Reisig told me too. It was PLI and cell site for the one and prtt for the other. It is ready to go.").

Mr. Williams was responsible for naming the files on the discovery disc that contained the cell phone data requested by the defense. See Gov. Ex. 6. These files were downloaded straight from the FBI's internal system. The labels were chosen based on the date ranges that Mr. Williams used to search the FBI's system for the cell phone data requested by the defense. (Tr. 8.21.18, at 66). The file that contained the cell site events was labeled 12/22/15-3/1/16, which was a longer date range than what he had actually requested from Sprint. (Tr. 8.21.18, at 69-70).

With respect to the affidavit presented to this Court, Mr. Williams testified that he created this affidavit together with Mr. Craig Severson, the Chief Division Counsel. (Tr. 8.21.18, at 75). A number of drafts of Mr. Williams' affidavit were passed between AUSA Reilly, Craig Severson, and Daniel Reisig with notes on what to change in Mr. Williams' affidavit. However, there is no evidence or emails from Mr. Williams indicating that he was adding or subtracting information from the affidavit. Similarly, there are no emails or other evidence that Mr. Williams ever weighed in on the accuracy or inaccuracy of the changes proposed by other government officials who were not sworn to the contents of his affidavit. (Tr.

Case: 4:19-cv-03119-DDN   Doc. #: 1   Filed: 11/18/19   Page: 22 of 44 PageID #: 22
Case: 4:15-cr-00404-HEA-NAB   Doc. #: 2167   Filed: 04/03/19   Page: 13 of 33 PageID #:
10212

8.21.18, at 76-82). When asked whether there was anything in his affidavit that he did not feel was accurate, he reaffirmed the truthfulness of his affidavit, despite repeatedly testifying contrary to what was contained in the affidavit. (Tr. 8.21.18, at 111).

SLMPD Officer Betz forwarded three February 5, 2016 warrants, applications, and affidavits for PLW/CSS records to SLMPD for service and to FBI for service. (Tr. 8.22.18, at 170). SLMPD Detective Corcoran served the legal demand in question on Sprint. (Tr. 2.7.19, at 6). The warrant and order were received by Sprint at 5:28 pm on February 5, 2016. (Tr. 2.7.19, at 10). In making these kinds of requests pursuant to warrants, Detective Corcoran always requests three things: GPS location of the phone, subscriber information for the phone, and call detail records with historical cell site information. (Tr. 2.7.19, at 7). He requests the historical records every time because, typically, officers need phone numbers from the historical documents to assist them in locating a phone, or the user of a phone number, throughout the investigation. (Tr. 2.7.19, at 43). The historical records are pertinent to every investigation. (Tr. 2.7.19, at 44). Detective Corcoran went on to explain that the historical records can help investigators determine where a suspect has been in the past, revealing certain patterns of behavior that could uncover a particular place where someone may be found. (Tr. 2.7.19, at 79).

Detective Corcoran acknowledged that after Sprint addresses the legal demand, they send an email saying that the legal demand is ready to retrieve and they provide the historical cell phone data, subscriber information and call tolls.

(Tr. 2.7.19, at 16, 54). Once a demand is received, processed and the records are available for download, the system on the user's end shows an icon with a folder and a green arrow pointing down to the folder. (Tr. 2.7.19, at 10). If the information has been downloaded, the icon changes to a picture of a folder with a much fainter green arrow. (Tr. 2.7.19, at 29). In order to begin the real-time tracking of a cell phone, an individual has to return to the L-Site and manually type in a place where the real time data will be sent to, as well as set up the frequency with which the information will be sent. If the user does not go back to the L-Site after the order is implemented, the user will not receive the precision location information. (Tr. 2.7.19, at 22).

The GPS or active location of the phone started occurring on February 6, 2016 around 1:15 am. (Tr. 2.7.19, at 13). This is the prospective location data that is provided by Sprint every 15 minutes during the period authorized by the warrant. (Tr. 2.7.19, at 13-14). Detective Corcoran stayed up late to input the order into the L-Site to make sure that SLMPD was receiving the data immediately.  (Tr. 2.7.19, at 19).

The historical cell site data file from Sprint came in one complete file and contained data starting January 7, 2016.  (Tr. 2.7.19, at 14,  35). Once the file is received, it can be edited by the user.  (Tr. 2.7.19, at 36). Information can be deleted from the spreadsheet that is received from Sprint (Tr. 2.7.19, at 36), however, Detective Corcoran conceded that it would be unlawful for any detective to manipulate the data. (Tr. 2.7.19, at 37).

Detective Corcoran could not recall if he downloaded the historic cell site information prior to November 2017. (Tr. 2.7.19, at 22). Whereas, out of an abundance of caution, Officer Betz asked Detective Corcoran to pull the historical cell site data SLMPD had because he knew they had them. (Tr. 8.22.18, at 238). Detective Corcoran verified that the historic records were in fact in the "packet," and placed the records into a shared drive that people in the St. Louis police department use. (Tr. 2.7.19, at 23). Detective Corcoran and AUSA Reilly sat down together and contacted Sprint to determine when the historic records had been downloaded by SLMPD. (Tr. 2.7.19, at 80-81). Importantly, the government submitted documents responsive to Defendants' Motions to Dismiss after November of 2017, yet, they never once disclosed that the SLMPD had their own copy of the historical records. (See Government's Response, Dkt. #1410).

The records available to the SLMPD from Sprint were contained in a zip file labeled 2016-029034. (Tr. 2.7.19, at 45). That file was downloaded onto a SLMPD TAG unit computer (Tr. 2.7.19, at 45, 46), where "(7)" was amended to the end of the file name. (Tr. 2.7.19, at 48). Other people in the TAG unit had access to the TAG computer and to the L-Site in 2016 (i.e.: Sergeant Marcos Silva and Detective Michael Reeves. (Tr. 2.7.19, at 49). Only those two individuals and Detective Corcoran were authorized to use the computer that could access the L-Site, however, Detective Corcoran did not discuss with either of those two individuals whether they had previously accessed the historical cell records in question. (Tr. 2.7.19, at 50). Once the records were downloaded, presumptively for

15

Case: 4:19-cv-03119-DDN   Doc. #: 1   Filed: 11/18/19   Page: 25 of 44 PageID #: 25
Case: 4:15-cr-00404-HEA-NAB   Doc. #: 2167   Filed: 04/03/19   Page: 16 of 33 PageID #:
10215

the seventh time, Detective Corcoran placed the records into a shared drive. (Tr.
2.7.19, at 51). The members of the intelligence division, around 40 people, had
access to that shared drive. (Tr. 2.7.19, at 51).

### III.   Officer Betz's Testimony Established that the Government Made False Misrepresentations to the Court

St. Louis Metropolitan Police Officer Betz did not believe that the
members of SLMPD's TAG unit would simply delete phone records received in
response to a Warrant if no one from the department had requested them. (8.22.18
Hr. Tr., p. 220).  In contrast, James Williams testified that whatever documents Mr.
Williams had on his computer with respect to this case were deleted from his
computer.  (Tr. 8.21.18, at 28).

On February 4, 2016, FBI agent Brandon Burke sent an email to many, if not
all, of the law enforcement personnel working on the investigation. See Def. Ex. M
(Bates #MG/OD-E-00263-266). According to Agent Burke's e-mail, he (and SLMPD
Officer Llewellyn) were the conduits to get all reports and discovery matters to the
U.S. Attorney's Office[2]. Def. Ex. M. In that same e-mail, Agent Burke went on to
inform the team the most recent development "is (now) subjects Dillon and Grady
intentionally obstructing justice as it relates to CW-A. More details on this matter
can be briefed in person in lieu of email." Def. Ex. M.

Hours later, Officer Betz sent an e-mail to Agent Burke and FBI agent
Edward Heppermann requesting the toll and subscriber information for a phone

---

[2] Remarkably, Agent Burke did not receive, review, or request the cellular records
SLMPD and the FBI received from Sprint nor the subpoenaed toll records Agent
Betz had specifically requested.

Case: 4:19-cv-03119-DDN   Doc. #: 1   Filed: 11/18/19   Page: 26 of 44 PageID #: 26
Case: 4:15-cr-00404-HEA-NAB   Doc. #: 2167   Filed: 04/03/19   Page: 17 of 33 PageID #:
10216

number associated with Grady, and a number associated with CW-C. Def. Ex. M. In

response, FBI Agent Hepperman asked SLMPD Officer Betz how long he wanted on

the tolls and what provider. Ultimately, Officer Betz requested 60 days, dating back

to at least December 2015. Later that day, DEA agent James Gaddy forwarded

Grady's toll records to SLMPD Officer Llewellyn and SLMPD Supervisor William

McDonough. See Def. Ex. A (Bates #MG/OD-E-00551-00552).

At the hearing, Officer Betz testified that at a meeting that encompassed

numerous people, members of the FBI and USAO, they were verbally informed of

an issue with historical cell site data maintained by the FBI, so he initiated a

search for the data he knew they had access to. (Tr. 8.22.18, at 194). Officer Betz

searched the FBI systems and located the subpoena and toll data for Grady's cell

phone records. On August 31, 2017, Officer Betz emailed members of the team,

including DEA Agent James Gaddy, FBI Agent Reisig, and Assistant U.S. Attorney

Michael Reilly, and informed them that of the results of his search: Grady's tolls

and subscriber data were received on 2/17/16 and contained data from 11/1/15

through 2/3/16; Officer Betz also referenced the 2/5/16 federal CSS warrant and

indicated he needed more information. See Def. Ex. B (Bates #MG/OD-E-00490-

492).

While Officer Betz testified that he had not reviewed, received, or requested

the results of the subpoenaed toll records that he has specifically requested via

email, he did acknowledge that other investigators reviewed the toll records, shared

the information with Officer Betz, and provided him a common call analysis from

that information. (Tr. 8.22.18 at 188). Officer Betz further admitted that he relied on that information in authoring and obtaining the 2/5/16 PLW warrant for Grady's cell phone. *Id.*

In an attempt to explain his inability or failure to request the historical cell site records that he knew SLMPD had in August 2017, Officer Betz claimed that he believed the FBI was taking the lead on producing the historical cell site data. (Tr. 8.22.18 at 176). On August 31, 2017, however, Officer Betz sent an email to the investigative team, including FBI agents, and referenced his search for records pertaining to the 2/5/16 federal CSS warrant and indicated he needed more information. Def. Ex. B. Contrary to James Williams' testimony and affidavit, Officer Betz testified that, subsequent to his August 31, 2017 email, he was not contacted or informed of an issue regarding the historical cell site records until November 2017. According to Betz, it was at that time that he took it upon himself – out of an abundance of caution – to obtain the historical cell site records he knew SLMPD had. However, even after SLMPD Officer Corcoran downloaded those records to a shared file, Officer Betz waited another 10 days before sharing them with Officer Llewellyn and the USAO. Curiously, the 10 days that passed between the download of the historical records to a shared file and sharing them with the USAO, was due to Officer Betz's desire to ensure the records were "in a format the government wanted it." (Tr. 8.22.18, at 178, 198, 227, 236). Ironically, Officer Betz could not recall who he spoke with at the USAO regarding the format of those records during that period of delay.

Furthermore, three cell site simulator warrants were issued on February 5, 2016 for targets: Grady, Dillon, and CW-C under 16MJ7058, 16MJ7059, and 16MJ7062, respectively. See Gov. Ex. M-1. SLMPD Officer Betz authored all three warrants. The language used in each of the three CSS warrants and applications for warrants is substantially similar. Officer Betz testified that he forwarded the warrant to SLMPD for service and to FBI for service. (Tr. 8.22.18, at 170). At the hearing, Officer Betz claimed that he had SLMPD Officer Corcoran execute the warrant to Sprint on 2/5/16, because Officer Betz knew FBI Agent James Williams did not work past 5:00p.m. and, therefore, would not return to execute the warrant until Monday, 2/8/16. (Tr. 8.22.18 at 206). Once again, Officer Betz could not recall whether he told Williams that an SLMPD technician had executed the same warrant a couple days earlier, or whether he (Betz) ever followed up on the return of the materials sought in the CSS/PLW/GPS warrants that he had authored. (Tr. 8.22.18 at 206, 213, 217).

On March 17, 2017, a return was filed with the court for all three warrants. Gov. Ex. M-1. A return is filed with the court in order to inform the court that the CSS/PLW/GPS warrant was executed, whether it was successful, and what was obtained. (Tr. 8.22.18 at 217). Although the affiant typically fills out the return, Officer Betz could not recall if he had filed the return or if he had seen the contents of the aforementioned returns. *Id.*

Specifically, as it relates to the sworn affidavit in support of a CSS warrant for Dillon, Officer Betz swore and affirmed to the court that he believed that Grady,

19

Dillon, and CW-C compartmentalized the use of their cell phones to maintain

contact with CW-A. See Def. Ex. L (16 MJ 7059 – Bates# MG/OD00857-904), p. 885.

When asked what evidence or information he had received that justified his

affirmations that Dillon ever used a phone to have contact with CW-A, Officer Betz

testified as follows:

> "In my opinion, is that page 4, that both Grady and Dillon act together
> and Grady and Terry have cell phones, and since Grady and Dillon are
> acting together, that it is my belief Dillon would also have a cell phone
> to contact him (CW-A)." (8.22.18 Hr.Tr., p. 223)

Although Betz claimed that, as of February 5, 2016, the government had

information that Grady had contact with CW-A and believed that the PLI/CSS

warrants would help them to identify if there was a covert cell phone Grady was

using to contact CW-A, the evidence collected as a result of the warrants failed to

establish the same. The government did not produce any discovery or present any

evidence relative to the returns filed with the court pertaining to the numerous

PLW/CSS/GPS warrants issued for the purpose of obtaining information on Grady

and/or Dillon. Despite the lack of additional support for CSS/PLW/GPS warrants for

Grady and Dillon's cellular phones, the government continued to request and obtain

warrants to continuously monitor and collect cell phone data of Grady and Dillon.

The government had absolutely no information that Dillon had cellular

contact with CW-A, CW-B, or CW-C, yet they continued to swear and attest that

they had probable cause to request, obtain, and monitor any cellular devices

believed to be associated with Dillon. Ultimately, neither the affirmations contained

in the search warrant applications or affidavits, nor the evidence collected from the

execution of those warrants corroborated or affirmed the government's "suspicions" that Dillon was involved in any criminal activity. Officer Betz was right about one thing, the government obtained PLW/CSS/GPS warrants for phones associated with Dillon simply because Dillon was an associate or had associations with Grady, and the government has reason to believe that CW-A and Grady both had cell phones, and communicated through cell phones.

## IV. Agent Gaddy's Testimony Established That The Government Knowingly Presented False Evidence To The Grand Jury

Agent Gaddy testified regarding the interviews of CW-B which took place on January 29, 2016 and February 2, 2016. *See* Transcript of Proceedings, August 22, 2018 ("Tr. 8.21.18"), at 78-79; *see also* Government Exhibit M-12. Present at those interviews, among others, were Agent Gaddy, Agent Lanham, Detective Lewellyn, and the prosecuting attorney in the instant matter. *Id.* In conjunction with Government Exhibit M-12, Agent Gaddy testified that CW-B informed all of the individuals present at the interviews that on approximately January 10th or 11th, Mr. Grady and Mr. Dillon met with CW-B. *Id.* at 80. This meeting, as this Court knows, is the crux of the allegations against the two defendants. Additionally, Agent Gaddy testified that CW-B had told them that he had also met with CW-A on either January 10 or 11, 2016. *Id.* at 80. Agent Gaddy further testified that CW-B informed the agents that later that same day, either January 10 or 11, he once again met with Mr. Grady and Mr. Dillon. *Id.* at 80-81. Agent Gaddy agreed that regardless of the "approximate" language of these dates, as the government has continuously harped on, that all of these meetings had to have taken place prior to

21

January 13, 2016. *Id* at 82.

Agent Gaddy also testified regarding the interviews of CW-B which took place on in July 2016 and November 2016. *See* Tr. 8.21.18, a 90, 95. The initial interview of CW-A took place at the time of his arrest with Agent Gaddy and Agent Betz present. *Id.* at 91. During this interview, the agents asks CW-A "if anyone directed or assisted him in fleeing the St. Louis area" to which CW-A responded "nobody helped him." *Id.* at 92-93. In reference to Mr. Grady and Mr. Dillon, CW-A merely referred to them as "crooks, they just want the dope man's money. . . that the paralegals filed paperwork on his behalf." *Id.* at 93. Agent Gaddy further clarified that CW-A never stated that Mr. Grady or Mr. Dillon ever "advised him to go anywhere", never "aided and abetted him for going anywhere", never "encouraged him to go anywhere", and "never consulted them to go anywhere". *Id.* at 93.

The next interviews with CW-A took place on November 14 and 15, 2016. *See* Tr. 8.21.18, at 95; *see also* Gov. Ex. M-13. During these interviews, many of the same individuals were present as those present during the interviews of CW-B, including Detective Lewellyn, Agent Lanham, Agent Gaddy, and the prosecuting attorney in this matter. *Id.* Agent Gaddy testified that during these interviews CW-A informed the individuals that he only flew back to St. Louis "early in the morning of the round up." *Id.* at 96. This was on January 13, 2016. *Id.* This meant that CW-B was in "Dallas prior to January 13th". *Id.*

At this point it becomes clear that the recollections of CW-A and CW-B are

wholly inconsistent with one another.  Simply put, it is impossible that CW-A could

have met with CW-B prior to January 13, 2016. Agent Gaddy, himself, agreed:

> Q.   You testified earlier that CW-B told you that he had to have met
> with [CW-A] prior to January 13th  based on the series of
> events that were outlined?
>
> A.   Correct
>
> Q.   You remember saying that?
>
> A.   Correct.
>
> Q.   So based on what CW-A is telling you, and based on what CW-B
> is telling you, both of those cannot be true at the same time?
>
> A.   Correct.
>
> Q.   And neither one of them is corroborated by the other; is that
> correct?
>
> A.   That's correct.
>
> \*      \*      \*
>
> Q.   Besides your conversations with CW-B, besides your
> conversations with CW-A, besides the phone records, any phone
> records that you got during your investigation, was there
> anything else or anyone else telling you that Mr. Grady and Mr.
> Dillon met with CW-B or CW-A on or about January 10th [or
> 11th], 201[6]?
>
> A.   No.

*See.* Tr. 8.21.18, at 97, 99-100.

To get to the root of the pattern of government misconduct, this Court must

juxtapose the statements given by both CW-A and CW-B not only with one another,

but with what the evidence in this matter has continuously shown; and that is a

pattern of not only reckless conduct, but willful misconduct.  While it is surely not

anomalous that two individuals give conflicting statement to government agents
during their interviews, it is undoubtedly "flagrant misbehavior" to present both of
these witnesses to the Grand Jury. *See Kearns*, 5 F.3d at 1253.

At the conclusion of the evidentiary hearing regarding the instant motion to
dismiss, this Court took judicial notice of the grand jury testimonies of CW-A and
CW-B. During their respective grand jury testimonies, both witnesses testified
consistently with what they had previously told agents and, still, contradictory with
one another. In essence, the government presented two witnesses before the grand
jury whose recollections were "not corroborated" by one other, and both of which
"cannot be true." *See* Tr. 8.21.18, at 71. Without a doubt, this lends to there being
"some evidence of gross deception by the prosecutor" before the grand jury,
considering that he was only present during the interviews that CW-A and CW-B
contradicted each other during.

What is more, the phone records that the government had in their possession
prior to presenting evidence to the grand jury further contradicted the evidence that
was presented to the grand jury. Agent Gaddy testified that on February 3, 2016 he
served a subpoena to Sprint requesting records for phone numbers associated with
Mr. Grady. *See* Tr. 8.21.18, at 84. Among those numbers was 314-766-2083. *Id.*
The records requested in this subpoena were specifically for "historical tolls" as they
were requested for January 4, 2016 through February 4, 2016. *Id.* at 85. Agent
Gaddy further testified that he forwarded these "historic toll" records to Detectives
McDonough and Lewellyn on February 4, 2016. *Id.* at 85-87; *see also* Defense

Exhibit D; *see also* Government Exhibit M-14.

These "historic tolls" that were forwarded by Agent Gaddy to two other investigating detectives who had been working in conjunction with the United States Attorney's Office investigation of Mr. Dillon and Mr. Grady, contained a column that was labeled as "NEID" which Agent Gaddy knew to be a cell phone tower identified. *See* Tr. 8.21.18, pgs. 87-89. For the sake of forgoing repetitiveness, this Court is well aware of the meaning of NEID. Several witnesses testified as to the meaning and accuracy of the NEID number associated with an outgoing call. Their testimony established two facts. First, that the NEID associated with the St. Louis area cannot be routed through the same NEID associated with the central Florida area. And second, that the calls made from Mr. Grady's phone on January 10 and January 11, 2016 could not have been made anywhere near the St. Louis area as they were routed through the NEID associated with central Florida.

This presents a subsequent issue in regard to the testimony presented by the government to the grand jury. Not only did they present testimony of two witnesses that completely contradicted each other, they were in possession of phone records that contradicted the testimony of at least one of those witnesses. In fact, Agent Gaddy agreed that these phone records that unimpeachably showed that Mr. Grady could not have been near St. Louis on January 10, 11, and part of January 12, 2016 were in the possession of the government in "February 2016", "during the interviews of CW-A", "during the interviews of CW-B". and "while these witnesses

were being presented to the grand jury." *See* Tr. 8.21.18, pg. 142. As it relates to Mr. Dillon, there was not a single called placed between him and CW-A or CW-B.

In all, Agent Gaddy's testimony alone shows that Mr. Grady and Mr. Dillon were unduly prejudiced by the governments misconduct. This misconduct was both "flagrant" and "substantial" as it related to the presentation of evidence to a grand jury during which time Mr. Grady and Mr. Dillon would not have an opportunity to defend themselves. While they acknowledge that the government is under no obligation to present exculpatory evidence; they are surely prohibited from presenting evidence that not only misleads the grand jury, but to which the government is in possession of direct, contradictory evidence. Based on their interviews of CW-A and CW-B, along with the phone records that were specifically requested and, in their possession, beginning on February 4, 2016, it is clear that at least one of them was lying, yet both were produced before the grand jury

## V.   The Government Made Similar False Misrepresentations To This Court In Its Filings

Aside from making false representations to the Grand Jury that returned an indictment against Mr. Grady and Mr. Dillon, the government in this case made representations to both this Court and the defense through their filings in response to the defendants' motions to compel and motions to dismiss. These misrepresentations became clear through the testimony of many of the witnesses who testified over the court of the four-day hearing. While this may not, in and of itself, present an independent basis for dismissal, prosecutorial misconduct can also be established by the government making similar false misrepresentations to the

court and the defendants in its filings and disclosures. *See United States v. Dollar*, 25 F.Supp.2d 1320 (N.D. Ala. 1998).

In *Dollar*, the government engaged in a wide range of misconduct, including misrepresenting in its supplemental bill of particulars that an associate acted as an agent for another when it had in its "exclusive possession" a sworn statement that the associate was acting for himself. *Id.* at 1331-32. The government made similar misrepresentations in other filings which caused the court to "question whether [the prosecution] has proceeded in this case in good faith." *Id.* at 1332. It had in its sole possession over ten witness statements that contradicted what the government's disclosures alleged they stated. *Id.* at 1327. The defense had consistently requested *Brady* and exculpatory evidence under Rule 16, and the government had "trampled" the defendants' constitutional rights by disclosing "as little as possible, as late as possible." *Id.* Due to the prejudice the defendant suffered, the charges against him were dismissed with prejudice. *Id.* The same should be done here.

### A.     Misrepresentations Regarding Cell Phone Records

The FBI mistakenly represented to Reilly that FBI not in possession of the cell site data. (Dkt. #1410, p. 21). On November 15, 2017, James Williams learned if he selected call detail records with cell site, and limited the records to begin on date warrant issued, FBI would still receive records prior to date of order. (Dkt. #1410, p. 21). However, Detective Corcoran testified that the parameters on his computer had always been set to their maximum, to view requests made up to three years previous. (Tr. 2.7.19, at 77-78).

27

Contrary to the government's position in their Response to Defendant Grady's Motion to Compel Production of Cellular Telephone Data that the government nor its agents did not request the historical cell site information (Government's Exhibit M-6F, para. 7), not only did the FBI receive multiple copies of the records on different occasions, but a separate agency, the SLMPD, also implemented the same order and was in possession of their own copy of the historical cell site data responsive to warrant 4:16 MJ 7061 SPM.  Despite sitting down personally with Detective Corcoran when he called Sprint to discuss the historical cell records, AUSA Reilly never disclosed in any of the government's filings that the SLMPD was also in possession of these records.

### B.    General Misrepresentations

CW-A absconded from the Eastern District of Missouri in January 2016 as specifically directed by Dillon and others. See Government's Response (Dkt. #1410), p. 3. CW-A confirmed that within days he fled to Dallas, Texas. (Dkt. #1410, p. 12).

CW-B statement that on approximately January 10th or 11th, 2016, Grady and Dillon began to contact CW-B, in an effort to provide information o CW-A about an indictment. CW-B told investigators that on the date of the arrests, January 13, 2016, Grady returned to his house with a copy of the indictment. CW-B said on January 14th or 15th, 2016, Grady and Dillon arrived at his home and said they had been at the courthouse. (Dkt. #1410, p. 6).

### C.    Purposeful Misrepresentations Regarding Evidence Relative to Dillon vs. Grady

The government has inexcusably intermingled Dillon with any and all

28

alleged criminal activity in which the government has alleged Grady may or may not have been involved. In countless filings, multiple in-court representations, and in affidavits in support of warrants pursued in this matter, the government uses the phrase "Dillon and Grady", despite the fact that the evidence on which the government relies makes no mention of Dillon's involvement.

While agents were meeting with CW-B on January 29, 2016, his phone received an incoming call from Grady's phone. CW-B was directed not to answer. In its filings the government maintains that this call to CW-B on the date of his arrest is "strongly corroborative of CW-B's statements regarding the relationship between CW-B, CW-A, and "Grady and Dillon"." (Dkt. 1410, p. 5). Evidence elicited at the hearing definitely established that there were no telephonic communications between Dillon and CW-A, CW-B, or CW-C. Fact that on January 13, 2016, Grady's phone activated a tower that could include Applebee's is consistent w/ CW-A's assertion he met "Dillon and Grady" at an Applebees. (Dkt. #1410, p. 18).

CW-B said he met Grady and Dillon near Delmonico's diner on January 17, 2016, the purpose of meeting was to deliver $10,000 to "Grady and Dillon." (Dkt. #1410, p. 6). CW-A successfully directed CW-B to deliver $10,000 in drug proceeds to Defendant Grady. (Dkt. #1410, p. 3). CW-A said he directed CW-B to pay "Grady and Dillon" an additional $10,000 following his flight to secure Grady's and/or Dillon's services and obtain an attorney through Grady and Dillon. (Dkt. #1410, p. 12). When CW-A was in Texas, he directed CW-C to contact CW-B and instruct CW-B to pay $10,000 to his lawyer (Grady). (Dkt. #1410, p. 13). Additionally, the

following are a non-exhaustive list of instances where the government engaged in the same sort of instances where the government engaged in artistic license to drive home facts that are simply not supported and contrary to the evidence in the instant matter:

- January 29, 2016 text message from Grady's phone to CW-C ("they locked up CW-B 2day from down on cottage, do"), government asserts corroborates investigation in relation to advise, counsel, and encouragement by *"Grady and Dillon"* to CW-A to abscond. (Dkt. #1410, p. 9).

- CW-A contacted Grady following Antonio Washinton's arrest. CW-A paid *"Grady and Dillon"* money to continue to obtain information and for other matters. (Dkt. #1410, p. 10).

- Following Jordan's August 27, 2015 indictment, CW-A paid money to *"Grady and Dillon"*. (Dkt. #1410, p. 11).

- On January 13, 2016, CW-A met Dillon at the Golden Pancake House, and the two traveled to Applebee's and met Grady. *"Grady and Dillon"* stated words to the effect that CW-A needed to get lost. *"Grady and Dillon"* stated words to the effect that CW-A needed to go far away for 18 months – 2 years. "They" explain it would be better for CW-A to stand alone. (Dkt. #1410, p. 11).

- Officer Llewellyn's December 1, 2016 testimony before the Grand Jury, which this Court took judicial notice of after an in-court review of said transcript, AUSA Reilly asks Officer Llewellyn the following: "in your opinion, would that tend to corroborate the information that CW-B that CW-C had a

relationship with *Grady and Dillon* and that CW-C directed CW-B when and where to meet Grady to pay him the second installment of $10,000 of drug money?" See Llewellyn Transcript, p. 132 (Bates #MG/OD-02753). AUSA Reilly once again knowingly and recklessly presented information that he knew to be false to the Grand Jury, in that, CW-B never told the government that CW-C had a relationship with Dillon.

## CONCLUSION

Although a grand jury is an accusatory body used by the government to obtain indictments against individuals they believe to have engaged in criminal wrongdoing, during which the government does not have a duty to present exculpatory evidence, the government does have the obligation to only present evidence that they know to be true. However, when the government presents false evidence to a grand jury, whether knowingly or recklessly, they undermine the integrity of the entire criminal justice system. This cannot be tolerated. An accused is generally defenseless during a grand jury investigation and individuals must have faith that if they were to be charges, such charges would be based on nothing less than truthful and accurate facts. When, instead, there are intentional misrepresentations, or there is a pattern of reckless misconduct, an irreparable violation of Due Process occurs, one which can only be cured by dismissing the indictment with prejudice. Here, it is readily apparent that there was a continuous pattern of not only reckless conduct but material misrepresentations being made in an effort to secure the charges against Mr. Grady and Mr. Dillon.

The crux of the allegations made against Mr. Grady and Mr. Dillon are based in a series of alleged meetings they allegedly had with CW-A and CW-B on January 10th or 11th, 2016. The evidentiary hearing in this matter has solidified several facts that were known to the government at the times they presented false and misleading evidence to the grand jury including, but not limited to, wholly contradictory statement from CW-A and CW-B – the main cooperating witnesses against the defendants – and, historical cell phone data for Mr. Grady's phone number – which were specifically requested and obtained by the multiple investigating agencies and the United States Attorney's Office – that unequivocally showed that Mr. Grady could not have been at those meetings. The evidentiary hearing also proved that there was absolutely no communication between Mr. Dillon and CW-A and/or CW-B.

As it has become abundantly clear, had the grand jury been apprised of the true facts, and not material misrepresentations, there would have been no probable cause found to return an indictment *See Napue v. People of the State of Ill.*, 360 U.S. 264, 270 (1959). Instead, the grand jury was presented evidence by the government which the government knew, or certainly should have known, was false and misleading. These misrepresentations continued throughout the affidavits submitted for various warrants and in subsequent filings in response to the defendants' motions for dismissal of the indictment. Wherefore, for those reasons, and all other reasons articulated both in prior written submissions and during the in-court evidentiary hearings, Mr. Grady and Mr. Dillon respectfully request this

Honorable Court enter an order granting the instant motion and dismissing, with

prejudice, the indictment in this case.

Respectfully submitted,


/s   *Blaire C. Dalton*
*An Attorney for Oscar Dillon, III*


/s   *Quinn Michaelis*
Attorney for Michael Grady


/s   *Vadim A. Glozman*
*An Attorney for Oscar Dillon, III*


Blaire C. Dalton, #6305696IL
DALTON LAW, LLC
53 W. Jackson Blvd., Ste. 1550
Chicago, Illinois 60604
(847) 373-4750
blairec.dalton@gmail.com

Vadim A. Glozman, #6315389IL
Vadim A. Glozman, Ltd.
53 West Jackson Blvd., Suite 1410
Chicago, Illinois 60604
(312) 726-9015
vglozman2@gmail.com

Quinn A. Michaelis, #6293379
150 North Michigan Avenue, Suite 800
Chicago, IL 60601
312-714-6920
qmichaelis@yahoo.com

Oscar Dillon III
Randolph County
200 W. Buena Vista
Chester Illinois 62233

US POSTAGE
$02.05
First-Class
Mailed From 62233
11/13/2019
032A 0061853625

Legal Mail

MAIL TO STATED
US MATERIALS

Clerk
United States District Court
750 Missouri Avenue
East St. Louis   Illinois 62201

Privileged
Mail

RECEIVED

NOV 18 2019

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS OFFICE